UNITED STATES DISTRICT CIRCUIT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| ZACKARY RILEY, in his individual capacity, ) | |
| ) | **JURY TRIAL DEMANDED** |
| and as representative of the estate of: ) | |
| ) | |
| ROSEMARY E. SCOTT, ) | |
| f/k/a ROSEMARY E. RILEY, ) | |
|         **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 2:15-cv-04294-MDH |
| ) | |
| LANDMARK HOSPITAL, ) | |
| CURATORS OF THE UNIVERSITY OF MISSOURI, ) | |
| DR. WALTER NICHOLS, ) | |
| BARNES-JEWISH HOSPITAL, ) | |
| ) | |
|   and ) | |
| ) | |
| DR. GREGORIO SICARD, ) | |
|         **Defendants.** ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Zackary M. Riley, in his individual capacity, and as representative of the estate of Rosemary E. Scott (f/k/a Rosemary E. Riley), through counsel, for his amended claims and causes of action against Defendants Landmark Hospital, Curators of the University of Missouri, Dr. Walter Nichols, Barnes-Jewish Hospital, and Dr. Gregorio Sicard, states:

## JURISDICTION AND VENUE

1.  The district courts have original jurisdiction of this civil action under 28 U.S.C. § 1332(a)(1):

  a. Defendants Landmark Hospital, Curators, and Barnes-Jewish Hospital are citizens of the State of Missouri;

b. Upon information and belief, Defendant Dr. Walter Nichols is a citizen of Missouri;

c. Plaintiff Zackary M. Riley is a citizen of the State of Ohio;

d. Upon information and belief, Dr. Gregorio Sicard is a citizen of either Missouri or Illinois; and

e. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in the Central Division of the Western District of Missouri under 28 U.S.C. § 1391 and Local Rule 3.1(b)2:

a. A substantial part of the events or omissions giving rise to the claim occurred in the Western District of Missouri, including the negligent medical treatment of Plaintiff's decedent at Landmark Hospital in Columbia, Missouri, and at the University of Missouri Hospital in Columbia, Missouri; and

b. Defendants Landmark Hospital and Curators reside in the Central Division.

## PARTIES

### *Plaintiff*

3. Plaintiff Zackary M. Riley is an individual over the age of twenty-one residing at 480 Carlotta Drive, Youngstown, Ohio 44504. At all times relevant to this Complaint, Plaintiff has been attorney-in-fact for decedent Rosemary E. Scott, f/k/a Rosemary E. Riley, under a durable power of attorney.

4. Plaintiff is the natural child of decedent Rosemary E. Scott, f/k/a Rosemary E. Riley.

### *Plaintiff's Decedent*

5. Plaintiff's decedent, Rosemary E. Scott, f/k/a Rosemary E. Riley ("Rosemary"),

lived in Boone County, Missouri, but died in Select Specialty Hospital, at 667 Eastland Ave SE, Warren, Ohio.

6. Rosemary was survived by her two natural children, Plaintiff Zackary M. Riley and Billy Riley.

*Defendants*

7. Barnes-Jewish Hospital ("Barnes") is a sole proprietorship, limited partnership, or other business entity located in St. Louis City, at 510 S Kingshighway Blvd, St. Louis, MO 63110. Barnes is a subsidiary or affiliate of BJC HealthCare.

8. Landmark Hospital ("Landmark") is a sole proprietorship, limited partnership, or other business entity located in Boone County, Missouri, at 604 Old 63 N, Columbia, MO 65201.

9. The Curators of the University of Missouri ("Curators") is the governing body of the University of Missouri, and an entity capable of suing and being sued. The University of Missouri maintains and operates a campus in Boone County, Missouri, and the Curators' mailing address is 316 University Hall, Columbia, MO 65211.

10. The University of Missouri system includes the University of Missouri Hospital ("MU Hospital"), which is a hospital affiliated with the University of Missouri Health Care System.

11. Dr. Walter Nichols is a medical doctor who provided treatment to Rosemary at MU Hospital in October and November 2013. Dr. Nichols was previously identified in this matter as a "John Doe" included in Defendant John Does 81 through 100.

12. Dr. Gregorio Sicard is a medical doctor who provided treatment to Rosemary at Barnes in November and December 2013. Dr. Sicard was previously identified in this matter as a "John Doe" included in Defendant John Does 101 through 120.

## AGENCY

13. At all relevant times, Barnes acted by and through its actual and ostensible employees and agents, including Dr. Gregorio Sicard and other medical staff providing treatment to Rosemary.

14. At all relevant times, Curators acted by and through their actual and ostensible employees and agents, including Dr. Walter Nichols and other medical staff providing treatment to Rosemary.

15. At all relevant times, Landmark acted by and through its actual and ostensible employees and agents, including medical staff providing treatment to Rosemary.

## GENERAL ALLEGATIONS

### *Previous Surgery Left Sponges in Rosemary's Abdomen*

16. Upon information and belief, in the 1970s or 1980s, Rosemary underwent one or more surgeries involving her abdominal area.

17. For the rest of her life, Rosemary suffered episodes of physical discomfort, pain, and gastrointestinal dysfunction, centered on her abdomen and the area of her back aligned with her abdomen.

18. As revealed in a postmortem examination, surgical sponges were present in Rosemary's abdomen at the time of her death.

19. The postmortem examination revealed that the sponges did not contain radiological tracers, from which fact the pathologist conducting the examination concluded that the sponges dated from the 1980s or earlier.

20. The examination further revealed that the presence of the sponges led to Rosemary's death: a bacterial infection had grown on the sponges, and this infection had spread

to Rosemary's internal organs, ultimately causing the internal bleeding that killed her.

### *Rosemary's Deterioration and Death*

21. In August 2013, Rosemary began suffering respiratory distress and disorientation, was taken to the MU Hospital emergency room by Plaintiff, then was admitted to the hospital.

22. MU Hospital negligently failed to provide Rosemary with appropriate or adequate medical treatment for several days during her hospital stay, including in that:

   a. MU Hospital did not run any tests on Rosemary;

   b. For approximately four days, MU Hospital did not treat Rosemary at all other than with albuterol nebulizer treatments like those she had already been using at home;

   c. MU Hospital refused to allow Plaintiff to speak to her doctors even though he properly documented to them his durable power of attorney;

   d. MU Hospital failed to place Rosemary on a bi-pap machine as Plaintiff requested despite her history of responding well to that treatment;

   e. MU Hospital put Rosemary on palliative care despite requests from Rosemary and Plaintiff for medical treatment;

   f. A tumor was discovered to be blocking Rosemary's airway;

   g. After seven days, MU Hospital told Riley Rosemary was going to be discharged, but the hospital agreed not to discharge Rosemary on the condition that she undergo a biopsy and receive cancer treatment;

   h. Rosemary was transferred to the Oncology Department of MU Hospital, where a nurse expressed alarm at Rosemary's respiratory rate and stated that Rosemary needed to be in the Intensive Care Unit instead;

   i. After Rosemary was transferred to the ICU, an ICU physician called Plaintiff and

5

told him Rosemary needed to be on a bi-pap and should have been placed on a bi-pap as soon as she was admitted to MU Hospital;

j. The ICU physician further stated that Rosemary was now in too much respiratory distress for a bi-pap and would need to be placed on a ventilator;

k. Rosemary was placed on a ventilator and underwent a biopsy;

l. The biopsy showed small cell lung cancer, but MU Hospital determined that Rosemary was an appropriate candidate for chemotherapy, advising Plaintiff and other family members that she could live "five good years" with cancer treatment;

m. Rosemary then underwent a round of chemotherapy, after which a small tumor was found in her brain and Rosemary became paralyzed on one side of her body;

n. Even though MU Hospital's oncology physicians had advised Plaintiff that steroids were mandatory in these circumstances, to prevent brain swelling, the hospital refused to treat Rosemary with steroids until an oncology physician intervened and insisted that Rosemary be given steroids;

o. Upon administration of the steroids, Rosemary's paralysis was alleviated;

p. MU Hospital later found that Rosemary had a low blood count and, without Plaintiff's consent, gave Rosemary a blood transfusion;

q. Rosemary had an anaphylactic reaction to blood transfusion, her tongue swelled until it filled her mouth and airway and protruded from her mouth, and she became paralyzed again, on one side of her body;

r. Approximately four hours later, MU Hospital staff called Plaintiff to obtain his consent to give Rosemary a blood transfusion;

s. When Plaintiff conditioned his consent on his being present during the transfusion,

MU Hospital staff admitted Rosemary had already been given a blood transfusion;

t. When Plaintiff came to the hospital and saw Rosemary's condition, he stated his belief that she was having an allergic reaction and requested that she be given an antihistamine;

u. MU Hospital refused, but the physician who refused did not give a medical reason, instead stating "Because I said no. We're not doing that.";

v. Plaintiff obtained some over-the-counter antihistamine and administered it himself to Rosemary, after which her swelling receded, her paralysis was alleviated, and her condition relatively improved;

w. Plaintiff later authorized a tracheotomy for Rosemary so she could be transferred to another facility;

x. Within days of the tracheotomy, Rosemary suffered spells of tachycardia, but MU Hospital staff told Plaintiff the symptoms were merely anxiety attacks;

y. Upon information and belief, these tachycardia spells were a sign that Rosemary had contracted septicemia, which MU Hospital failed to properly diagnose or treat;

z. Around this time, Rosemary began having nausea and repeatedly attempted to vomit;

aa. After Rosemary was given multiple anti-nausea treatments that acted on her brain and nervous system, Riley insisted to doctors that they try to alleviate the nausea with treatments that acted on her stomach instead;

bb. Prior to the tachycardia spells, hospital staff in the ICU had brought into Rosemary's room a single-use whiteboard that had been used in another patient's room and had not been cleaned since that use;

cc. At the time the staff brought the unsterile whiteboard into Rosemary's room, Rosemary was on infection control precautions;

dd. In addition to the tachycardia spells, other signs of infection appeared that should have alerted MU Hospital to an infection, including chunks of infection in Rosemary's urinary catheter tube; and

ee. When Plaintiff alerted the physician on morning rounds to the chunks of infection, the physician refused to look at the catheter, stating, "They all look that way."

23. Despite the other issues with her treatment at MU Hospital, detailed above, Rosemary responded well to the chemotherapy part of her treatment.

24. As a result of her good response to the chemotherapy, MU Hospital advised Rosemary that she had a five-year life expectancy with continued treatment.

25. On or about October 1, 2013, Rosemary was transferred to Landmark to complete her recovery from her first round of chemotherapy and to wean her from the ventilator.

26. Within a few days at Landmark, Rosemary's condition began to deteriorate further, including repeated and almost uncontrollable spells of tachycardia.

27. Plaintiff urged Landmark physicians and staff to investigate the reason for his mother's decline, but Landmark never discovered the sponges.

28. For days, Plaintiff tried to find or contact Landmark physician Dr. Ramez Sunna, who was treating Rosemary, but Dr. Sunna did not respond to Plaintiff's attempts.

29. Finally, on or about October 24, 2013, Plaintiff confronted Dr. Sunna, relating Rosemary's symptoms in detail, and demanded that Dr. Sunna himself examine Rosemary.

30. Upon doing so, Dr. Sunna almost immediately stated that he suspected a blood infection and ordered a blood draw.

31. Tests on the blood draw showed that Rosemary had acquired at least two blood infections.

32. High-level antibiotics were intravenously administered to Rosemary on October 25 but on or about October 26, 2013, she coded and was resuscitated.

33. Around that time, while Rosemary was at Landmark, two canisters of dried blood resembling coffee grounds were removed from Rosemary's stomach.

34. Rosemary transferred to MU Hospital, and MU Hospital diagnosed Rosemary with a "walled off" ruptured abdominal aorta.

35. MU Hospital refused to operate on Rosemary or give her other aggressive medical treatment to save her life.

36. MU Hospital physician Defendant Dr. Walter Nichols refused to take such measures for Rosemary "because of her age," told Plaintiff they would be a "waste of resources," and remarked "You have to ask yourself: what are you saving here, anyway?"

37. Dr. Nichols and other MU Hospital staff also refused to perform exploratory surgery or an endoscopy on Rosemary.

38. MU Hospital never discovered or addressed the sponges in Rosemary's abdomen.

39. With MU Hospital refusing to give Rosemary life-saving treatment, on or about November 4, 2013, Plaintiff took Rosemary to Barnes.

40. Plaintiff chose to take Rosemary to Barnes because he was told by Defendant Dr. Gregorio Sicard that Barnes would perform aortic surgery on Rosemary.

41. Despite Dr. Sicard's assurance and Plaintiff's many pleas, Barnes also refused to operate on Rosemary or give her life-saving treatment.

42. Dr. Sicard incorrectly diagnosed Rosemary with a rupture of the abdominal aorta

and concurred with Dr. Nichols's refusal to operate on Rosemary.

43. Despite agreeing that Barnes would operate on Rosemary, and only after Rosemary had traveled to St. Louis from Columbia, Dr. Sicard refused Plaintiff's requests to operate on Rosemary, including requests to perform exploratory surgery and to conduct a gastrointestinal endoscopic study, instead ordering comfort care.

44. During Rosemary's stay at Barnes, Plaintiff overheard Barnes medical staff, including Dr. Sicard, discussing Barnes's refusal to operate.

45. In that overheard conversation, the staff discussed that Rosemary's Medicare coverage would continue for only 30 more days of hospital stay, after which she would be covered only by Medicaid, and that a procedure to save her life would result in a 60-day hospital stay.

46. Plaintiff inferred from that conversation that the unprofitability of saving Rosemary's life was a major factor in Dr. Sicard's and Barnes's refusals to provide the necessary treatment.

47. Meanwhile, Rosemary's condition continued to deteriorate.

48. Plaintiff pleaded and argued with Barnes, citing the Emergency Medical Treatment and Active Labor Act (EMTALA) and insisting that Barnes must act to save Rosemary, but Barnes continued refusing to perform the treatment Plaintiff requested.

49. Rather than provide further care, Barnes flew Rosemary to Select Specialty Hospital, in Warren, Ohio, at Barnes's expense.

50. Plaintiff wanted Barnes to operate, not to move Rosemary, but he authorized the move in the hope that an operation might be available at Select Specialty.

51. No one at Barnes discovered or addressed the sponges in Rosemary's abdomen.

52. By the time Rosemary reached Select Specialty Hospital, it was too late for

10

Case 2:15-cv-04294-MDH   Document 98   Filed 02/01/17   Page 10 of 19

effective treatment.

53. Rosemary died in Select Specialty Hospital on December 19, 2013.

54. Dr. Stephen Godfrey, the pathologist who examined Rosemary after her death and discovered the retained surgical sponges, told Plaintiff that had Landmark, MU Hospital, or Barnes operated to remove the sponges, Rosemary would have lived.

## COUNT I

## WRONGFUL DEATH – MEDICAL NEGLIGENCE

### (Landmark)

54. Plaintiff incorporates Paragraphs 1 through 53 as if fully set out herein.

55. When Rosemary sought treatment at Landmark, her life could have been saved if her symptoms and condition had been properly diagnosed and had appropriate medical intervention been made.

56. Had Landmark properly diagnosed and treated Rosemary, she would not have needed to seek treatment at another facility.

57. Landmark's medical staff acted as agents of Landmark when they negligently treated Rosemary, proximately causing her death.

58. As a direct and proximate result of Landmark's reckless, careless and negligent acts, Plaintiff Zack Riley sustained damages in excess of $ 75,000, including from the loss of Rosemary's companionship, comfort, instruction, guidance and counsel, under § 537.080 of the Revised Statutes of Missouri, as a result of Rosemary's death.

WHEREFORE, Plaintiff pray for judgment against Landmark for such sums as are fair and reasonable, including punitive damages, together with any and all costs herein incurred, and for such other relief as this Court deems just and proper.

## COUNT II

## WRONGFUL DEATH – LOST CHANCE OF RECOVERY OR SURVIVAL

### (Landmark)

59. Plaintiff incorporates Paragraphs 1 through 53 as if fully set out herein.

60. When Rosemary sought treatment at Landmark, her life could have been saved and prolonged if her symptoms and condition had been properly diagnosed and had appropriate medical intervention been made.

61. Had Landmark and its medical staff met their duty of care in treating Rosemary, she would not have needed to seek treatment at another facility.

62. As a direct and proximate result of Landmark's reckless, careless and negligent care of Rosemary, Rosemary lost a substantial chance of recovery, and as such, is entitled to damages in excess of $75,000 for said loss under § 537.021 of the Revised Statutes of Missouri.

63. Landmark's medical staff acted as agents of Landmark when they negligently failed to properly diagnose and treat Rosemary, causing loss of chance of recovery and survival.

64. Rosemary's cause of action for lost chance of recovery and survival survives her death and belongs to her estate.

WHEREFORE, Plaintiff pray for judgment against Landmark for such sums as are fair and reasonable, including punitive damages, together with any and all costs herein incurred, and for such other relief as this Court deems just and proper.

## COUNT III

## WRONGFUL DEATH – PUNITIVE DAMAGES

### (Landmark)

65. Plaintiff incorporates paragraphs 1 through 64 as if fully set out herein.

66. Landmark committed one or more willful, wanton, and malicious acts as more fully set forth above, which individually or cumulatively justify that submission of punitive damages in this case.

67. Landmark knew or had information from which it should have known, in the exercise of ordinary care, that its conduct created a high degree of probability of injury or death of Rosemary and other similarly situated patients.

68. Landmark's willful, wanton, and malicious acts evidence a complete indifference and conscious disregard for the safety of Rosemary and others similarly situated, justifying the submission of punitive damages in this case.

WHEREFORE, Plaintiff prays for judgment against Landmark for such sums are as fair and reasonable, including punitive damages to punish and deter Landmark, and others similarly situated, from engaging in like conduct, together with any and all costs herein incurred, and for such other relief this Court deems just and proper.

## COUNT IV

## WRONGFUL DEATH – MEDICAL NEGLIGENCE

### (Curators, Dr. Walter Nichols)

69. Plaintiff incorporates Paragraphs 1 through 53 as if fully set out herein.

70. When Rosemary sought treatment at MU Hospital, her life could have been saved and prolonged if her symptoms and condition had been properly diagnosed and had appropriate medical intervention been made.

71. Had MU Hospital medical staff, including Dr. Walter Nichols, properly diagnosed and treated Rosemary, she would not have needed to seek treatment at another facility.

72. MU Hospital's and Dr. Walter Nichols's negligent failure to properly diagnose and

treat Rosemary caused or contributed to her death by permitting the infection to worsen and cause internal damage that brought about her death.

73. MU Hospital medical staff, including Dr. Walter Nichols, were acting as agents of MU Hospital and Curators when they negligently failed to properly diagnose and treat Rosemary, causing or contributing to her death.

74. MU Hospital and Dr. Walter Nichols were acting as agents of Curators when they negligently failed to properly diagnose and treat Rosemary, causing or contributing to her death.

75. As a direct and proximate result of Defendant Curators' and Dr. Walter Nichols's reckless, careless and negligent acts, Plaintiff Zack Riley sustained damages in excess of $ 75,000, including from the loss of Rosemary's companionship, comfort, instruction, guidance and counsel, under § 537.080 of the Revised Statutes of Missouri, as a result of Rosemary's death.

WHEREFORE, Plaintiff pray for judgment against Defendant Curators and Defendant Dr. Walter Nichols, for such sums as are fair and reasonable, including punitive damages, together with any and all costs herein incurred, and for such other relief as this Court deems just and proper.

## COUNT V

## WRONGFUL DEATH – LOST CHANCE OF RECOVERY OR SURVIVAL

**(Curators, Dr. Walter Nichols)**

76. Plaintiff incorporates Paragraphs 1 through 53 as if fully set out herein.

77. When Rosemary sought treatment at MU Hospital, her life could have been saved and prolonged if her symptoms and condition had been properly diagnosed and had appropriate medical intervention been made.

78. Had Defendants Curators and Dr. Walter Nichols met their duty of care in treating Rosemary, she would not have needed to seek treatment at another facility.

79. As a direct and proximate result of Defendant Curators' and Dr. Walter Nichols's reckless, careless and negligent care of Rosemary, Rosemary lost a substantial chance of recovery, and as such, is entitled to damages in excess of $75,000 for said loss under § 537.021 of the Revised Statutes of Missouri.

80. MU medical staff, including Dr. Walter Nichols, were acting as agents of MU Hospital and Curators when they negligently failed to properly diagnose and treat Rosemary, causing loss of chance of recovery and survival.

81. MU Hospital and Dr. Walter Nichols were acting as agents of Curators when MU Hospital negligently failed to properly diagnose and treat Rosemary, causing loss of chanced of recovery and survival.

82. Rosemary's cause of action for lost chance of recovery and survival survives her death and belongs to her estate.

WHEREFORE, Plaintiff pray for judgment against Defendants Curators and Dr. Walter Nichols for such sums as are fair and reasonable, including punitive damages, together with any and all costs herein incurred, and for such other relief as this Court deems just and proper.

## COUNT VI

## WRONGFUL DEATH – PUNITIVE DAMAGES

**(Curators, Dr. Walter Nichols)**

83. Plaintiff incorporates paragraphs 1 through 53 and paragraphs 69 through 82 as if fully set out herein.

84. Defendants Curators and Dr. Walter Nichols committed one or more willful, wanton, and malicious acts as more fully set forth above, which individually or cumulatively justify that submission of punitive damages in this case.

85. Defendants Curators and Dr. Walter Nichols knew or had information from which they should have known, in the exercise of ordinary care, that their conduct created a high degree of probability of injury or death of Rosemary and other similarly situated patients.

86. Defendants Curators' and Dr. Walter Nichols's willful, wanton, and malicious acts evidence a complete indifference and conscious disregard for the safety of Rosemary and others similarly situated, justifying the submission of punitive damages in this case.

WHEREFORE, Plaintiff prays for judgment against Defendants Curators and Dr. Walter Nichols for such sums are as fair and reasonable, including punitive damages to punish and deter those defendants, and others similarly situated, from engaging in like conduct, together with any and all costs herein incurred, and for such other relief this Court deems just and proper.

## COUNT VII

## WRONGFUL DEATH – MEDICAL NEGLIGENCE

### (Barnes, Dr. Gregorio Sicard)

87. Plaintiff incorporates Paragraphs 1 through 53 as if fully set out herein.

88. When Rosemary sought treatment at Barnes, her life could have been saved and prolonged if her symptoms and condition had been properly diagnosed and had appropriate medical intervention been made.

89. Had Defendants Barnes and Dr. Gregorio Sicard properly diagnosed and treated Rosemary, she would not have needed to seek treatment at another facility.

90. Defendants Barnes' and Dr. Gregorio Sicard's negligent failure to properly diagnose and treat Rosemary caused or contributed to her death by permitting the infection to worsen and cause internal damage that brought about her death.

91. Barnes medical staff, including Dr. Gregorio Sicard, were acting as agents of

16

Case 2:15-cv-04294-MDH Document 98 Filed 02/01/17 Page 16 of 19

Barnes when they negligently failed to properly diagnose and treat Rosemary, causing or contributing to her death.

92. As a direct and proximate result of Defendants Barnes' and Dr. Gregorio Sicard's reckless, careless and negligent acts, Plaintiff Zack Riley sustained damages in excess of $ 75,000, including from the loss of Rosemary's companionship, comfort, instruction, guidance and counsel, under § 537.080 of the Revised Statutes of Missouri, as a result of Rosemary's death.

WHEREFORE, Plaintiff pray for judgment against Defendants Barnes and Dr. Gregorio Sicard for such sums as are fair and reasonable, including punitive damages, together with any and all costs herein incurred, and for such other relief as this Court deems just and proper.

## COUNT VIII

## WRONGFUL DEATH – LOST CHANCE OF RECOVERY OR SURVIVAL

### (Barnes, Dr. Sicard)

93. Plaintiff incorporates Paragraphs 1 through 53 as if fully set out herein.

94. When Rosemary sought treatment at Barnes, her life could have been saved and prolonged if her symptoms and condition had been properly diagnosed and had appropriate medical intervention been made.

95. Had Defendants Barnes and Dr. Gregorio Sicard met their duty of care in treating Rosemary, she would not have needed to seek treatment at another facility.

96. As a direct and proximate result of Defendants Barnes' and Dr. Gregorio Sicard's reckless, careless and negligent care of Rosemary, Rosemary lost a substantial chance of recovery, and as such, is entitled to damages in excess of $75,000 for said loss under § 537.021 of the Revised Statutes of Missouri.

97. Barnes medical staff were acting as agents of Barnes when they negligently failed

17

Case 2:15-cv-04294-MDH   Document 98   Filed 02/01/17   Page 17 of 19

to properly diagnose and treat Rosemary, causing loss of chance of recovery and survival.

98. Rosemary's cause of action for lost chance of recovery and survival survives her death and belongs to her estate.

WHEREFORE, Plaintiff pray for judgment against Defendants Barnes and Dr. Gregorio Sicard for such sums as are fair and reasonable, including punitive damages, together with any and all costs herein incurred, and for such other relief as this Court deems just and proper.

## COUNT IX

## WRONGFUL DEATH – PUNITIVE DAMAGES

### (Barnes, Dr. Sicard)

99. Plaintiff incorporates paragraphs 1 through 53 and paragraphs 87 through 98 as if fully set out herein.

100. Defendants Barnes and Dr. Gregorio Sicard committed one or more willful, wanton, and malicious acts as more fully set forth above, which individually or cumulatively justify that submission of punitive damages in this case.

101. Defendants Barnes and Dr. Gregorio Sicard knew or had information from which they should have known, in the exercise of ordinary care, that their conduct created a high degree of probability of injury or death of Rosemary and other similarly situated patients.

102. Defendants Barnes' and Dr. Gregorio Sicard's willful, wanton, and malicious acts evidence a complete indifference and conscious disregard for the safety of Rosemary and others similarly situated, justifying the submission of punitive damages in this case.

WHEREFORE, Plaintiff prays for judgment against Defendants Barnes and Dr. Gregorio Sicard for such sums are as fair and reasonable, including punitive damages to punish and deter those defendants, and others similarly situated, from engaging in like conduct, together with any

and all costs herein incurred, and for such other relief this Court deems just and proper.

                                            Respectfully Submitted,

                                            /s/ Andrew G. Heitmann
                                            Andrew G. Heitmann # 60679
                                            3948 Saratoga Ct.
                                            Fulton, MO 65203
                                            (573) 819-9814
                                            *Attorney for Plaintiff*

## Certificate of Service

The foregoing was served on February 1, 2017, upon all attorneys of record in this matter as of that date, including the attorneys for defendants named in the First Amended Petition but not the Second Amended Petition, through the Court's electronic filing system.

                                            /s/Andrew G. Heitmann
                                            Attorney for Plaintiff